UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BEXTERMUELLER NEWS DISTRIBUTORS, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 4:22-CV-00344-SPM ) |
| LEE ENTERPRISES, INC., et al., | ) ) ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment as to Count IV of the Petition Asserting Claims Under § 537.330 RSMo. (Doc. 53). The motion has been fully briefed, and the Court has heard oral argument on the motion. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 13). For the following reasons, the motion will be granted.

**I. FACTUAL BACKGROUND**

Plaintiffs Bextermueller News Distributors, Inc., and Tom Richards[1] are newspaper carriers and deliver newspapers to home delivery subscribers under written agreements with the St. Louis Post-Dispatch (collectively, the "Agreements."). Defs.' SUMF, Doc. 55, ¶ 1; Exhibits 1-5. Each Agreement describes the carrier (or "distributor") as a self-employed independent contractor who has the right to operate his or her own business. Pls.' SUMF, Doc. 65, ¶ 1. Each Agreement states that the carrier agrees to deliver the newspaper to home delivery subscribers for

---

[1] The claims of Plaintiffs J-Y Distributors, LLC; Teep Enterprises, Inc.; Glen Eddings; and Doyle Underwood were dismissed with prejudice. The claims of Plaintiff Brian Taylor were dismissed without prejudice. (Doc. 58). The claims of Plaintiffs Bextermueller News Distributors, Inc. and Tom Richards remain pending.

1

compensation set out in the Agreement. *Id.* ¶ 2. Each Agreement defines a carrier delivery area, set forth in an attached map or maps, and states that the Publisher "recognizes the exclusive home delivery rights" of the carrier in the area set forth in the map, and provides, "The Publisher will not terminate such territorial rights or aid, abet or assist in the creation of other home delivery systems or [carriers/distributors] within all or any part of the territory set forth in [the map]," subject to exceptions not at issue in this case. *Id.* ¶ 5; Exhibits 1, 3, & 5, ¶ 7. Each Agreement also states that the carrier has the right to sell and assign all or any portion of its rights under the Agreement at any time to any person for such compensation or payment as may be agreed upon between the carrier and the assignee, provided, inter alia, that the Publisher provide prior written approval for such an assignment. Pls.' SUMF, ¶ 3. Each Agreement also states that the Agreement continues in effect until the Publisher ceases publication of the Post-Dispatch, and that all of the Publisher's rights, duties and obligations and other provisions of the Agreement apply to all successors and assigns of the Publisher. *Id.* ¶ 4.

Each of the Agreements also contains a waiver provision. Section 15(b) of the Bextermueller Agreement provides:

> In consideration of the right granted to Distributor pursuant to this Agreement, the validity and sufficiency of which is hereby acknowledged, Distributor, on behalf of itself and its heirs, successors, executors, administrators and assigns (hereinafter "Heirs"), hereby waives any and all rights which it may now or hereafter have under any statute, law, ordinance, common law principle or otherwise, to effect, by any means, the continuation of this Agreement or any rights granted pursuant hereto, or the payment of any compensation to Distributor or his Heirs as a result of any termination, expiration, forced assignment or cancellation (hereinafter collectively referred to as "termination") of this Agreement, except as expressly provided for in this Agreement. Without limiting the foregoing, Distributor hereby waives any alleged property rights which Distributor may now or hereafter have in any Distributor route, territory, customers or customer lists and any right to any compensation based upon any principle of waiver or estoppel or any other principle. The rights of the parties hereto including their Heirs with regard to any continuation of this Agreement or any compensation in connection with any termination or forced assignment or purchase hereof, are and shall be limited only to those express

contractual rights as set forth in this Agreement.

Bextermueller Agreements, Defs.' Exhibits 1 & 3, § 15(b). Section 14(b) of the Richards Agreement is identical to Section 15(b) of the Bextermueller Agreements, except that the term "Distributor" is replaced with the term "Carrier." Defs.' Exhibit 5, ¶ 14(b).[2] The terms and conditions of the Agreements presented by the Post-Dispatch to prospective carriers were not negotiated or changed from the pre-printed form other than to fill in certain blanks and were presented on a "take it or leave it" basis, including waiver language. Pls.' SUMF, ¶ 6.

The carrier routes are personal property. *Id.* ¶ 7. Sales of carrier routes occurred as typified by the sale to Tom Richards and Gary Bextermueller. *Id.* ¶ 8. A sale typically would occur by a seller giving the Post-Dispatch notice of intent to sell its route; the carrier would then enter into an agreement with a purchaser, the purchaser would provide to the Post-Dispatch a credit application, and the Post-Dispatch would confirm the customers of the seller and provide the form Distributor Agreement for the new carrier to sign. *Id.* The Post-Dispatch routinely consented to the collateralization of a loan taken out by a Buyer to pay for the purchase of the route. *Id.* ¶ 9. It was not uncommon for carriers to use the route being acquired and the Distributor Agreement as collateral for a purchase loan. *Id.* ¶ 10. For example, Tom Richards collateralized his loan from Commerce Bank in the approximate amount of $330,000.00 to purchase his routes from Winston and Marietta Carron by pledging his Distributor Agreement as collateral. The Post-Dispatch agreed that the Distributor Agreement could be collateral for the loan. *Id.*

In addition to traditional newsprint newspapers delivered to home delivery subscribers, Defendants have created or aided in the creation of digital delivery systems of its products in

---

[2] Defendants erroneously indicated that the section on which they rely was numbered section "14(b)" in both Agreements.

Plaintiffs' subscription areas. Defs.' SUMF ¶ 5; Pls.' SUMF ¶ 11.

On February 8, 2022, Plaintiffs filed the instant action against Defendants in the Circuit Court for the City of St. Louis, Missouri, asserting that Defendants' creation and use of an electronic delivery system for the Post-Dispatch breached the Agreements and damaged Plaintiffs' property interests in their routes and their relationships with their customers. Plaintiffs asserted five counts: (I) breach of contract, (II) breach of implied covenant of good faith and fair dealing, (III) tortious interference with business expectancy, (IV) malicious trespass to personalty (violation of Mo. Rev. Stat. § 537.330), and (V) punitive damages. Defendants removed the case to this Court on March 24, 2023, on the basis of diversity jurisdiction. The Court subsequently dismissed Count (III), the tortious interference claim. (Doc. 59).

In the instant motion, Defendants seeks summary judgment on Count IV, the malicious trespass to personalty claim.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Accord, e.g., Smith v. Lisenb*e, 73 F.4th 596, 600 (8th Cir. 2023). The movant "bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.*, and "must provide more than conjecture and

4

speculation," *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022). "In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). "In reaching its decision, a court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* (internal quotation marks omitted).

### III. DISCUSSION

Because this Court's jurisdiction in this case is based on diversity of citizenship, state law governs the substantive issues in this case. *See, e.g.*, *Am. Home Assur. Co. v. Pope*, 591 F.3d 992, 998-99 (8th Cir. 2010) ("In a diversity action, such as this, we use state substantive law to govern our analysis.") (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). The parties agree that Missouri provides the governing law. In interpreting state law, a federal court is "bound by the decisions of the state's highest court." *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 534 (8th Cir. 2006) (quoting *Eichenwald v. Small*, 321 F.3d 733, 736 (8th Cir. 2003)). "When a state's highest court has not decided an issue, it is up to [the] court to predict how the state's highest court would resolve that issue.'" *Id.* (quoting *Continental Cas. Co. v. Advance Terrazzo & Tile Co.*, 462 F.3d 1002, 1007 (8th Cir. 2006)). In making that determination, the decisions of intermediate state appellate courts are persuasive authority. *Id.*

In Count IV, Plaintiffs assert a claim of Malicious Trespass to Personalty, in violation of Mo. Rev. Stat. § 537.330.[3] Plaintiffs allege that they have proprietary interest in, and are the

---

[3] This statute provides:
> If any person shall maliciously or wantonly damage or destroy any personal property, goods, chattels, furniture or livestock, the person so offending shall pay to the party injured double the value of the things so damaged or destroyed; and upon an affidavit that said damage or destruction was wantonly or maliciously done, it shall be a good ground for an attachment to issue, as in other cases by attachment.

5

owners of, their routes within geographic territories on which they deliver Post-Dispatch newspapers, their goodwill, and their business reputations (collectively, "Plaintiffs' Property"). Pet'n, ¶ 35. They allege that Defendants' actions in creating and maintaining a system of electronic delivery of the Post-Dispatch "were malicious and wanton, and a deliberate and intentional attempt to damage the Plaintiffs' Property." *Id.* ¶ 36. They further allege that Defendants' actions were without justification or excuse, in that Defendants were motivated by an improper motive—to harm Plaintiffs and render their routes valueless, and to trigger an arbitration for Plaintiffs to give up their routes. *Id.* ¶ 37. Plaintiffs allege that as a result of Defendants' conduct, the value of Plaintiffs' Property has been damaged. *Id.* ¶ 38. They also allege that Defendants' conduct was outrageous due to improper motive or reckless indifference, thereby justifying an award of double the amount of damage to the value of Plaintiffs' Property as provided by statute. *Id.* ¶ 39.

In their motion, Defendants argue that they are entitled to summary judgment because in the Agreements, Plaintiffs waived any statutory claims under § 537.330 and any other claims not specifically based on the Agreements. In their motion, Defendants rely on the waiver paragraph as a whole, without specifying which part or parts of the provision they believe applies. At the hearing, Defendants clarified that they are relying principally on the second sentence of the waiver paragraph, which states:

> Without limiting the foregoing, Distributor hereby waives any alleged property rights which Distributor may now or hereafter have in any Distributor route, territory, customers or customer lists and any right to any compensation based upon any principle of waiver or estoppel or any other principle.

Bextermueller Agreements, Defs.' Exhibit 1 & 3, § 15(b); Richards Agreement, Exhibit 5, § 14(b).

Defendants contend that through this contractual language, Plaintiffs waived their property rights in their routes, and thus they have no basis on which to bring a malicious trespass to personalty claim. Defendants rely on general Missouri principles of contract interpretation for their

6

argument. They argue that where, as here, the terms of a contract are unequivocal, plain, and clear, the Court is bound to enforce the contract as written.[4]

The Court agrees with Defendants that through this waiver language, Plaintiffs clearly waived their property rights in their routes. Under Missouri law, "Courts are bound to enforce a contract as written if the terms of the contract are clear, plain and unequivocal." *Kells v. Missouri Mountain Props., Inc.*, 247 S.W.3d 79, 85 (Mo. Ct. App. 2008) (citing *Malan Realty Inv'rs., Inc. v. Harris,* 953 S.W.2d 624, 626-27 (Mo. 1997)). Plaintiff does not argue that the language in the waiver is ambiguous, nor does the Court find it to be ambiguous.

In their opposition, Plaintiffs do not dispute that the waiver language, if enforced, would bar their claim for malicious trespass to personalty. Instead, they make two arguments: (1) the waiver is unenforceable because it was not the intentional relinquishment of a known right; and (2) Defendants should be equitably estopped from enforcing the waiver, because through their course of conduct, Defendants have acted as if the Agreements *do* provide Plaintiffs with property rights.

### A. Whether the waiver is unenforceable because it was not the intentional relinquishment of a known right

Plaintiffs argue that the waiver provision is should not be enforced because Defendants have not sustained their burden of showing that Plaintiffs were aware of the waiver provision in the Agreements or that Plaintiffs intentionally relinquished a known right to the ownership of their property and potential claims for damages from Defendants.

---

[4] Defendants also argue that although Bextermueller News Distributors, inc. was not an original signer of the Bextermueller Agreement, is an assignee of the original signer and thus is still subject to the waiver set forth in the Agreement. Plaintiffs do not dispute this assertion.

Plaintiff's argument is without merit. "The law is well settled that one who signs a contract is presumed to have known its contents and accepted its terms." *Warren Supply Co. v. Lyle's Plumbing, L.L.C.*, 74 S.W.3d 816, 819 (Mo. Ct. App. 2002). *See also Mead v. Moloney Sec. Co.*, 274 S.W.3d 537, 542 (Mo. Ct. App. 2008) ("[I]n the absence of fraud or other wrongdoing, a party who signs or accepts a written contract is presumed to know its contents and to assent to them."); *Midwest Printing, Inc. v. AM Int'l, Inc.*, 108 F.3d 168, 170 (8th Cir. 1997) ("Under Missouri law, 'a person who has an opportunity to read a document but signs it without doing so is held to have knowledge of the document's contents, absent a showing of fraud.'") (quoting *United States for Use of Bussen Quarries, Inc. v. Thomas,* 938 F.2d 831, 833 (8th Cir. 1991)). Here, by showing that Plaintiffs signed the Agreements, Defendants have met their burden of showing that Plaintiffs assented to the terms of the Agreements.

Plaintiffs cite no cases that support their suggestion that signing a contract with a clear waiver provision in it is not sufficient to show a knowing waiver. Plaintiffs rely entirely on a generic definition of waiver that comes from a 1955 decision in which the court considered whether a party had waived a cause of action through a statement made at trial in a prior action. *See Dunn v. Pickard*, 284 S.W.2d 6, 9 (Mo. App. 1955) ("According to the generally accepted definition, a waiver is the intentional relinquishment of a known right. It is a voluntary act, and implies an election by the party to dispense with something of value or to forego some advantage which he might at his option have demanded and insisted upon. To constitute a waiver of an existing right, benefit, or advantage, knowledge of its existence and an intention to relinquish it are essential. One is not bound by a waiver of his rights, unless such waiver is distinctly made, with full knowledge of the rights which he intends to waive, and the fact that he knows his rights, and intends to waive them must plainly appear, and the burden is on him who claims a waiver to

8

prove it.") (quotation marks omitted). That case did not involve contract law and is inapplicable here.

### B. Whether Defendants should be equitably estopped from enforcing the waiver based on their prior conduct

Plaintiffs next argue that Defendants should be equitably estopped from enforcing the waiver provision, because enforcing that provision would be inconsistent with the position Defendants have taken for years and that Plaintiffs have relied on—that Plaintiffs have property rights in their routes.

Equitable estoppel "stands simply on a rule of law which forecloses one from denying his own expressed or implied admission which has in good faith and in pursuance of its purpose been accepted and acted upon by another." *Miskimen v. Kansas City Star Co.,* 684 S.W.2d 394, 400 (Mo. Ct. App. 1984) (quoting *Peerless Supply Co. v. Industrial Plumbing & Heating Co.*, 460 S.W.2d 651, 665-66 (Mo. 1970)). Equitable estoppel "requires a showing of three elements: (1) an admission, statement, or act inconsistent with the claim afterward asserted or sued upon; (2) action by the other party on the faith of the admission, statement, or act [also known as the "reliance" element]; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate the admission, statement, or act." *Immigr. L. Grp., LLP v. McKitrick*, 484 F.3d 998, 1001 (8th Cir. 2007) (citing *Stone v. Crown Diversified Indus. Corp.*, 9 S.W.3d 659, 668 (Mo. Ct. App. 1999)). The second element requires that the party claiming estoppel "acted in reliance and to his detriment up on the admission or conduct of the one estopped" and was "misled to his prejudice." *Miskimen*, 684 S.W.3d at 401.

Equitable estoppel "rests on the unique facts and circumstances of each case." *Cent. Parking Sys. of Mo., LLC v. Tucker Parking Holdings, LLC*, 519 S.W.3d 485, 496 (Mo. Ct. App. 2017). "[I]t is clear that relief by estoppel is not favored by courts, and 'will not be applied

9

lightly.'" *Id.* (quoting *Back Ventures, L.L.C. Series D v. Safeway, Inc.*, 410 S.W.3d 245, 255 (Mo. Ct. App.)). "[A]n estoppel 'will not arise unless justice to the rights of others demands it.'" *Id.* (quoting *Shores v. Express Lending Servs., Inc.*, 998 S.W.2d 122, 127 (Mo. Ct. App. 1999)). *See also Miskimen*, 684 S.W.2d at 400 ("An equitable estoppel cannot arise unless justice demands it; it cannot be used as a sword to create or work a positive gain for the claimant but can only act as a shield to protect him from a loss which he could not otherwise escape.").

To support their equitable estoppel argument, Plaintiffs rely primarily on *Miskimen*, another case involving contracts between a newspaper and carriers. In that case, the Kansas City Star had contracts with its carriers giving the Kansas City Star the right to terminate the contracts at any time, on a few days' notice. *Id.* at 396. For decades, the Kansas City Star regularly exercised its termination rights, but only when it raised the wholesale price, and always by offering the carriers new contracts that were identical to the old ones except for the change in wholesale price. *Id.* Over the years, the practice was for the carriers to buy and sell their routes, and the Kansas City Star often took an active role in those sales. *Id.* at 396-97. The carriers also used their routes as collateral for loans. *Id.* at 397. The Kansas City Star also allowed and encouraged the carriers' designation of their spouses or children as successors to their routes. *Id.* The Kansas City Star also made public statements acknowledging that the carriers owned their routes. *Id.* at 397-98. After many decades of this arrangement, the Kansas City Star filed a declaratory judgment, seeking a declaration that it had the right and the power to terminate its contracts with the carriers. *Id.* at 395. The carriers argued that they had more than a mere contract right to deliver the defendant's newspapers—that they had proprietary interests in their routes or at least had been induced by the company's conduct to expect that they had such interests and to rely upon having them. *Id.* at 396. They argued, *inter alia*, that the company should be equitably estopped from enforcing the

10

termination-at-will provision. *Id.* at 399-400. The trial court found no equitable estoppel, but the Missouri Court of Appeals reversed that decision and held that the Kansas City Star was estopped from exercising its contractual right to terminate the contracts. *Id.* at 400.

With regard to the first element of equitable estoppel, the Missouri Court of Appeals found that "the company's position that it can terminate these contracts at will upon notice is almost totally inconsistent with its actual conduct for over ninety years," noting that the company had treated the routes as property by approving of and actively participating in the selling of the routes, by countenancing the practice of the carriers' use of their routes as collateral, and by treating the routes as property that could pass to family members upon death. *Id.* at 401. With regard to the second element (reliance), the court noted that the prices paid for some routes were between $200,000 and $300,000 and found that "[n]o one in his right mind would purchase anything for such a large sum believing that his right to keep and work and continue to profit from the property could be terminated upon four days notice." *Id.* It found, "Nothing could be more obvious than that the carriers in purchasing the routes and in devoting their lives and fortunes to build their businesses acted in reliance on the company's previous owners' and managers' explicit and implicit representations and acts giving assurance that the contractual relationship was a lasting one and not subject to unilateral termination without cause." *Id.* With regard to the third element, the court found that the injury to the carriers was clear, because "[t]he market value for the routes was abruptly destroyed by the attempted cancellations." *Id.* at 401-02. The court concluded by finding that "[t]o permit the company to change its delivery system without compensating the carriers for the loss of their businesses would be manifestly unfair." *Id.* at 402.

The Court finds *Miskimen* distinguishable and finds that the facts presented here do not warrant a finding of equitable estoppel. First, unlike *Miskimen*, the instant case is not a situation

in which justice demands equitable estoppel in order to avoid a situation that would be manifestly unfair. In *Miskimen*, if the court had allowed the newspaper to enforce the termination provisions, carriers who had invested hundreds of thousands of dollars in their routes would have been abruptly left with nothing of value and no remedy in either contract law or property law. As the court noted, this would have been "manifestly unfair." *Id.* at 402. Here, in contrast, Plaintiffs do have a remedy: breach of contract. Plaintiffs have asserted claims for breach of contract and breach of the implied covenant of good faith and fair dealing in this case, and they continue to pursue those claims. Indeed, at oral argument, counsel for Defendants indicated that Plaintiffs have an expert who has quantified Plaintiffs' damages based on a contract theory.[5] This simply is not a situation wherein justice demands the use of equitable estoppel to protect Plaintiffs from a "loss which [they] could not otherwise escape." *See Miskimen*, 684 S.W.2d at 400.

Second, the Court finds that the elements of equitable estoppel are not satisfied here, because Plaintiffs have not shown that they acted in reliance on prior representations by Defendants that are inconsistent with Defendants' current position. Plaintiffs here—like the carriers in *Miskimen*—appear to have relied on "explicit and implicit representations and acts giving assurance that the contractual relationship was a lasting one and not subject to unilateral termination without cause" when they purchased their routes and invested time and money in them.

---

[5] At oral argument, Plaintiffs' counsel suggested that if the waiver provision is enforced, Plaintiffs will be left without a remedy. However, that argument is squarely at odds with the fact that Plaintiff is actively pursuing their breach of contract claim.
  Plaintiffs also appear to suggest that because the Agreements do not provide any contractual rights to Plaintiffs to seek damages for default or breach, limiting Plaintiffs to the contractual right to seek compensation under the contract would result in an inability to seek damages for any breach by the Post-Dispatch. Again, that argument is at odds with the fact that Plaintiffs are pursuing a breach of contract claim. Moreover, a contract need not contain a specific remedy clause for a remedy to exist for a breach of the contract.

*Id.* at 401. And if Defendants here were to take the position the newspaper took in *Miskimen*—that the contracts are terminable at will on a few days' notice—the Court would likely find Defendants were estopped from doing so. But that is not the position Defendants are taking here. Defendants' position is not that they can terminate the contracts at will, but rather that Plaintiffs waived their property interests in their routes and therefore cannot enforce those property rights through the malicious trespass statute. The Court finds little in the record to suggest that Plaintiffs acted in reliance specifically on having a "property interest" in their routes, as opposed to having a lasting contractual relationship, when they purchased and invested in their routes. There is certainly nothing in the record to suggest that Plaintiffs relied specifically on the ability to bring a malicious trespass to personalty claim when they purchased and invested in their routes. Instead, it appears that Plaintiffs acted in reliance on having a lasting contractual relationship, and their alleged injuries result from the alleged breach of that contractual relationship. They can, and are, seeking damages for that breach under principles of contract law. Under these circumstances, the Court does not find that Defendants should be estopped from asserting the waiver provision to bar Plaintiffs from bringing a malicious trespass to personalty claim.

In sum, based on the undisputed facts, Defendants have established that Plaintiffs waived by contract their right to enforce any property rights under the malicious trespass to personalty statute, and the Court finds that Defendants should not be equitably estopped from asserting that waiver provision. Therefore, Defendants are entitled to summary judgment on Count IV.

### IV.   CONCLUSION

For the reasons stated above, the Court finds that Defendants are entitled to summary judgment on Count (IV), malicious trespass to personalty under Mo. Rev. Stat. § 537.330. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment as to Count IV of the Petition Asserting Claims Under § 537.330 RSMo (Doc. 53) is **GRANTED**.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of August, 2023.