UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BEXTERMUELLER NEWS DISTRIBUTORS, INC., et al., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 4:22-CV-00344-SPM |
| LEE ENTERPRISES, INC., et al., | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion to Exclude the Proffered Testimony of Melissa Gragg, CVA, MAFF, Plaintiffs' damages expert. (Doc. 84). Specifically, Defendants contend Ms. Gragg's damages opinion should be excluded as unreliable and irrelevant because it disregards the requirement in a breach of contract action that the plaintiff's damages, if any, be the result of (or otherwise flow from) the alleged breach. The motion has been fully briefed, and the Court has heard oral arguments on the motion. After carefully considering the parties' arguments and written submissions and the relevant law, the Court finds the motion should be granted for the reasons discussed below.

    **I.**    **Factual and Procedural Background**[1]

Plaintiffs Bextermueller News Distributors, Inc., and Tom Richards[2] are newspaper carriers who deliver St. Louis Post-Dispatch newspapers to home delivery subscribers under

---

[1] Unless otherwise specified, these facts are taken from the parties' statements of undisputed material fact submitted in connection with Defendants' motion for summary judgment and the exhibits attached thereto.

[2] The claims of Plaintiffs J-Y Distributors, LLC; Teep Enterprises, Inc.; Glen Eddings; and Doyle

1

written agreements with the Defendants (collectively, the "Agreements."). Each Agreement states that the carrier agrees to deliver the newspaper to home delivery subscribers for compensation set out in the Agreement. Each Agreement defines a carrier delivery area, set forth in an attached map or maps. Each Agreement states that the Publisher "recognizes the exclusive home delivery rights" of the carrier in the area set forth in the map, and provides, "The Publisher will not terminate such territorial rights or aid, abet or assist in the creation of other home delivery systems or [carriers/distributors] within all or any part of the territory set forth in [the map]," subject to exceptions not at issue in this case.

Plaintiffs' expert report indicates that Plaintiff Bextermueller began operating under the Agreement in 1994, and Plaintiff Richards began operating under the Agreement in 2000. At some point around 2017, Defendants created and began offering an electronic version of the Post-Dispatch. On February 8, 2022, Plaintiffs filed the instant action against Defendants, alleging that Defendants' creation and use of an electronic delivery system for the Post-Dispatch breached the Agreements and damaged Plaintiffs' property interests in their routes and their relationships with their customers. After resolution of various motions, the claims still pending for trial are Count I (breach of contract) and Count II (breach of the implied covenant of good faith and fair dealing). In Count I, Plaintiffs allege that Defendants breached the Agreements by "aiding, abetting, and assisting in the creation of a system of e-delivery of the St. Louis Post-Dispatch newspaper for delivery of the newspaper to customers who reside within the Plaintiffs' territory." Pet'n, Doc. 10, ¶ 18. In Count II, Plaintiffs allege that Defendants "breached their covenant of good faith and fair

---

Underwood were dismissed with prejudice. The claims of Plaintiff Brian Taylor were dismissed without prejudice. (Doc. 58). The claims of Plaintiffs Bextermueller News Distributors, Inc. and Tom Richards remain pending.

2

dealing implied in the Agreements by, among other things, improperly interfering with Plaintiffs' business of home delivery of St. Louis Post-Dispatch newspapers and by establishing a new delivery system in their territories with absolutely no compensation to the Plaintiffs." *Id.* ¶ 25.

To support their damages calculation for the breach of contract and breach of implied covenant of good faith and fair dealing claims, Plaintiffs offer the report and testimony of Melissa Gragg, CVA (Certified Valuation Analyst), MAFF (Master Analyst in Financial Forensics). *See* Gragg Report, Doc. 84-1. Ms. Gragg states in her report that she was engaged "to quantify Plaintiffs' lost revenue suffered as a result of the alleged actions of [Defendants] as claimed in this case." *Id.* at 1. She states that she assumed as true Plaintiffs' allegation that Defendants "breached the Home Delivery Agreements by assisting in the creation of a system of electronic delivery [also known as digital delivery] of the St. Louis Post-Dispatch newspaper for delivery of the newspaper to customers who reside within the Plaintiffs' specified geographic territories as defined by the Agreements." *Id.* at 2. She states that she has "formulated an opinion on the lost revenues from the Defendants' alleged actions." *Id.*

To calculate Plaintiffs' past lost revenue, Ms. Gregg considered every subscriber to the newspaper's digital-only version ("digital-only subscriber") that was in each plaintiff's assigned route areas from January 1, 2017 to February 5, 2023. She then multiplied the number of digital-only subscribers by the fee that Defendants are required to pay to Plaintiffs for each newspaper they deliver.[3] She did a similar calculation to estimate future lost revenue for the 15-year period

---

[3] This methodology is not entirely clear from Ms. Gragg's report, which is heavily redacted, but Plaintiffs' counsel confirmed during oral argument that this was her approach.

3

following February 5, 2023, which was adjusted by a calculation to determine the present value of the lost revenue.[4]

On October 10, 2023, Defendants filed a motion to exclude Ms. Gragg's expert testimony. *See* Docs. 84 & 85. Plaintiffs filed their opposition brief on October 24, 2023. *See* Doc. 87. On November 3, 2023, Defendants filed their reply in support of the motion. *See* Doc. 88. Finding oral argument would help the Court resolve Defendants' motion, the Court heard oral argument on the motion on November 29, 2023. The Court heard arguments from both parties, including additional arguments and case law from Plaintiffs' counsel that were not included in Plaintiffs' original opposition brief.

After hearing the arguments of both parties, the crux of the dispute around the admissibility of Ms. Gragg's testimony appears to be whether Ms. Gragg's damages calculations are contrary to law. Defendants do not challenge Ms. Gragg's qualifications. They argue her testimony is irrelevant and unreliable because her lost revenue calculations are based on the erroneous premise that Plaintiffs are entitled to recover, as damages, delivery fees for every digital subscriber in Plaintiffs' territories even though there is evidence suggesting that not every digital subscriber would have been a print subscriber for which Plaintiffs would have received fees. In response, Plaintiffs contend the Agreements required Defendants to pay Plaintiffs a fee for every delivery made in their geographic areas (regardless of who made the delivery or how it was made). As such,

---

[4] To estimate expected future lost revenue (those expected after February 5, 2023), she used data from the 3/7/22-2/5/23 period and assumed the number of digital deliveries would remain the same over the next 15 years. She considers this a conservative estimate given that digital deliveries have historically increased each year, that she assumed the distributor fee rate from 2023 would not increase over time, and that she made calculations based on only 15 years despite the fact that the Agreements continue in perpetuity.

4

Plaintiffs posit that Ms. Gragg's lost revenue calculations are consistent with Missouri contract damages law in that they reflect the benefit of their contracted-for bargain.

## II. LEGAL STANDARDS

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[5] This rule imposes a gatekeeping responsibility on the district court, requiring the court to ensure that expert testimony is both relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).

---

[5] This version of Rule 702 became effective on December 1, 2023, replacing a prior version that read as follows:
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (effective until December 1, 2023). The Court's decision would be the same under either version of the rule.

In *Daubert*, the Supreme Court set forth several factors for courts to use in assessing the reliability of expert testimony: (1) whether the theory or technique can be and has been tested, (2) whether it has been subjected to peer review, (3) whether there is a high known or potential rate of error, and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. 509 U.S. at 593-94. The factors identified in *Daubert* "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co.*, 526 U.S. at 150 (internal quotations omitted). Courts may also consider factors such as "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (internal quotation marks omitted).

"The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citing *Daubert*, 509 U.S. at 592). "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court." *Landmark Infrastructure Holding Co., LLC v. R.E.D. Invs., LLC*, 933 F.3d 906, 910 (8th Cir. 2019) (quotation marks omitted). Although "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," *Daubert*, 509 U.S. at 596, "[e]xpert opinions that are contrary to law are inadmissible." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005). Such opinions "cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact." *Id. See also Southard v. United Reg'l Health Care Sys., Inc.*, No. 7-06-CV-11-L, 2008 WL 4489692, at *2 (N.D. Tex. Aug. 5, 2008)

6

("[W]here as here, the expert's opinion is based on an erroneous legal premise, it is appropriate to exclude such testimony.").

### III. DISCUSSION

In this case, the admissibility of Ms. Gragg's damages testimony turns on whether her opinions rest on an erroneous legal premise. As such, the Court begins its analysis with a review of what damages the law permits for the claims asserted here—breach of contract/breach of the implied covenant of good faith and fair dealing.

Under Missouri law, "'Damages for breach of contract are limited to the loss of the benefit itself,' with the goal of placing the wronged party 'in the position he would have been in had the contract been performed.'" *Randy Kinder Excavating, Inc. v. J.A. Manning Constr. Co., Inc.*, 899 F.3d 511, 520 (8th Cir. 2018) (quoting *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 67 (Mo. 2000)). *See also Amalaco, LLC v. Butero*, 593 S.W.3d 647, 652 (Mo. Ct. App. 2019) ("Ultimately, the goal in awarding damages for breach of contract is to place the injured party in the *same* position as if the contract had been performed, and the court must reject any award of damages that would elevate the injured party to a *better* position."). Missouri courts have identified three types of breach of contract damages a plaintiff may recover: actual damages, consequential damages, and benefit-of-the-bargain (lost profits) damages. *Curators of Univ. of Missouri v. Suppes*, 583 S.W.3d 49, 61 (Mo. Ct. App. 2019) (citing *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817 (Mo. Ct. App. 2008)).

> "Actual damages are compensatory and are measured by the loss or injury sustained" as a direct result of the wrongful act. *Stiffelman v. Abrams*, 655 S.W.2d 522, 531 (Mo. banc 1983). Consequential damages "are those damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the defendant at the time of the parties' agreement." *Ullrich [v. CADCO, INC.*, 244 S.W.3d 772, 779 (Mo. Ct. App. 2008)]. Finally, benefit-of-the-bargain damages, also called lost profits damages, are the "net profits a plaintiff would have realized" had the contract not been

7

breached. *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. banc 2005).

*Catroppa*, 267 S.W.3d at 818.

Plaintiffs assert Ms. Gragg's lost revenue calculations reflect their benefit-of-the-bargain or lost profit damages. Specifically, Plaintiffs argue that because the Agreements granted Plaintiffs the exclusive right to distribute the newspaper within their territories, *every* digital-only subscriber within Plaintiffs' geographic territories represents lost revenue for Plaintiffs, regardless of whether the digital subscriber would ever have subscribed to a print newspaper. Plaintiffs state that they are "due a fee for deliveries occurring in their exclusive territory under the terms of the Distributor Agreements, no exception is made for digital deliveries." Pls.' Mem. Opp'n, Doc. 87, at 7. They also state that Ms. Gragg "assum[ed] in her Report that deliveries to subscribers in the territories justify a fee to the plaintiffs because that is what their agreement says." *Id.* Plaintiffs argue that it does not "matter if the digital customers would have no interest in having the printed version delivered." *Id.* at 5.

### A.   *The Agreements Do Not Support Ms. Gragg's Lost Revenue Calculations*

If, as Plaintiffs have repeatedly asserted, the Agreements required Defendants to pay Plaintiffs a fee for every delivery made in their geographic areas (regardless of who made the delivery or how it was made), Plaintiffs' argument that they were entitled to recover a fee for every newspaper—print or digital—delivered within their respective territories might have some merit. In that situation, if Defendants began delivering to digital subscribers within Plaintiffs' territories, Plaintiffs could argue that, by its terms, the Agreements required Defendants to pay Plaintiffs for ***every delivery made in their geographic areas (regardless of who made the delivery or how it was made)*** and thus Plaintiffs' bargained-for-benefit of payment for each delivery made in their district (regardless of who made it) included payment for digital deliveries made by Defendants.

In that case, assuming Defendants refused to pay Plaintiffs for the digital deliveries, the number of digital subscriptions, multiplied by the applicable delivery fee, would represent the "net profits a plaintiff would have realized had the contract not been breached." *Catroppa*, 267 S.W.3d at 818 (internal quotation marks omitted).[6] And awarding damages in the amount of those fees would place Plaintiffs "in the position [they] would have been in had the contract been performed"—the goal of damages in a breach of contract action. *See Randy Kinder Excavating, Inc.*, 899 F.3d at 520.

However, Plaintiffs have not directed the Court to any provision of the Agreements that entitles Plaintiffs to a fee for every delivery made in their territories, regardless of who makes it or how it is made. The Agreements require Defendants to pay the Plaintiff-carriers a set fee "for each . . . copy of the St. Louis Post-Dispatch . . . delivered to home delivery subscribers **by the Carrier.**" Bextermueller Agreement, Exhibit 3 to Defs.' Mot. Summ. J., Doc. 55-3, at ¶ 5(a);  Richards Agreement, Exhibit 5 to Defs.' Mot. Summ. J., Doc. 55-5, at ¶ 5(a) (emphasis added). Plaintiffs do not argue that the digital versions of the Post-Dispatch were delivered "by the Carrier." Moreover, the breach of contract alleged in this case (as articulated in both Plaintiffs' Petition and Ms. Gragg's report) is *not* that Defendants failed to pay Plaintiffs a fee for deliveries made within the territories as required by the Agreements. Rather, Plaintiffs allege Defendants breached their contractual obligation to refrain from creating an alternative delivery system. To the extent that Ms. Gragg's opinion is based on the presumption that the Agreements entitle Plaintiffs to a fee for

---

[6] Solely for purposes of resolving the instant motion, the Court will assume that a carrier's "net profits" are equivalent to its lost revenue, with no adjustment required to account for any reduction in expenses the carrier may have experienced as a result of delivering fewer newspapers. The parties do not discuss the issue of gross revenue vs. net profits in their briefing, and Ms. Gragg does not address it in her report.

9

each digital delivery, it is not supported by the language of the Agreements and thus is so fundamentally unsupported that it can offer no assistance to the jury. *See Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (noting that "if [an] expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded" and that "an expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported").

### B.     Ms. Gragg's Lost Revenue Calculations Are Inconsistent with Legal Principles Governing the Measure of Damages in Breach of Contract Actions

Defendants argue that Ms. Gragg's approach is contrary to the legal principle that a plaintiff may only recover damages that *result from* the alleged breach of contract. The Court agrees. Under Missouri law, the goal of breach of contract damages is to place the wronged party in the position he would have been in had the contract been performed. Where, as here, the damages sought are lost profits, the damages are the net profits the wronged party "would have realized" if the contract had not been breached. Ms. Gragg's damages calculations is not consistent with this legal principle. For example, Ms. Gragg's approach lacks any attempt to determine how many digital subscribers represent revenue that Plaintiffs would have realized in the absence of a digital-only delivery system. As Ms. Gragg acknowledged at her deposition, and as Plaintiffs do not appear to dispute, it is quite possible that some of the digital-only subscribers used in Ms. Gragg's calculations are people with no interest in a print newspaper, who would never have been print subscribers even without a digital-only option.[7] The amount of revenue Plaintiffs "would have

---

[7] Defendants point out that there are numerous reasons why a person might be interested in subscribing to a digital-only version of the newspaper but not a print version—for example, environmental concerns, price considerations, or a desire to be able to access content anywhere. When Ms. Gragg was asked at her deposition whether she agreed that "some households that subscribe to the digital product, digital-only product, would not subscribe to the printed version no matter what," she responded, "I'm sure that's a possibility, yes." Defs.' Ex. B, Gragg Dep. 45:7-

realized" from those subscribers if the breach had not occurred is $0. Thus, fees from those subscribers cannot qualify as lost profits damages under Missouri law. Yet Ms. Gragg makes no attempt to determine how many subscribers fell into that category and/or to account for those subscribers in her lost revenue calculations; instead, she simply includes them.[8]

Because Ms. Gragg's lost revenue calculations include digital subscribers who would never have subscribed to the print version of the newspaper and would never have generated revenue for Plaintiffs, her calculations are inconsistent with Missouri law on breach of contract damages. A hypothetical question posed to Plaintiffs' counsel during oral argument helps illustrate the issue. The Court asked Plaintiffs' counsel to assume a situation in which 25% of the households in a carrier's territory were print subscribers to the St. Louis Post-Dispatch (the "print households"), and the other 75% were people who would never subscribe to a print edition under any circumstances (the "never-print households"). In the hypothetical situation, after the St. Louis

---

11. Plaintiffs do not argue in their briefing, and did not argue at oral argument, that all (or even most) of the digital subscribers used in Ms. Gragg's calculations would have been print subscribers in the absence of a digital-only option. Instead, they insist that it does not matter.

[8] Notably, Defendants produced some data that would have been relevant to the question of how many digital-only subscribers would have been print subscribers absent the digital-only option— a spreadsheet from which it can be determined which print subscribers switched to digital subscriptions and when they did so. However, either Plaintiffs did not provide it to Ms. Gragg or they did provide it and Ms. Gragg did not consider it.

In its briefing, Plaintiffs argue that this data was produced in a "lengthy Excel document" that was a "gobbledygook document that could not be deciphered by plaintiffs or their experts to provide any meaningful information as to which specific subscribers to the print version switched to the electronic version." Pls.' Mem. Opp'n, Doc. 87, at 7. For the reasons stated in Defendants' reply, the Court disagrees. Although the document at issue lacks names and addresses, a review of the data in the document would allow Plaintiffs to determine, by unique identification number, which subscribers switched from print to digital and when they did so. The absence of names or addresses does not make it impossible to determine the number or the timing of these print-to-digital switchers. The Court finds that this information was available to Plaintiffs.

Post-Dispatch created a digital-only delivery option, none of the 25% print households switched to the print option, but all 75% of the never-print households became digital-only subscribers. The carrier's revenue thus remained the same as it would have been had no breach occurred. Plaintiffs' counsel confirmed that under Plaintiffs' damages theory and Ms. Gragg's approach, Plaintiffs' damages for lost revenue in this situation would be the delivery fees for all 75% never-print/digital-only households. This approach is inconsistent with Missouri law on lost profits damages and contract damages in general. By allowing the carriers to recover delivery fees for 75% of the population that would have never signed up for print deliveries, this approach places the carriers in a better position than they would have been in if there had been no breach—an approach expressly prohibited under Missouri contract law. *See Amalaco, LLC*, 593 S.W.3d at 652 ([T]he court must reject any award of damages that would elevate the injured party to a *better* position.").

For the above reasons, the Court finds that Ms. Gragg's method of calculating Plaintiffs' lost revenue is contrary to Missouri law. Her opinion contains no analysis of what revenue were actually lost *as a result of* the breach alleged here—i.e., what revenue Plaintiffs would have realized if the contract had the breach not occurred. Instead, Ms. Gragg appears to include in her lost revenue calculations fees that would never have been realized by Plaintiffs, with or without a breach, and which are not recoverable as contract damages as a matter of law. Thus, her opinion is not relevant or reliable and cannot assist the jury, and it must be excluded. *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible. They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact."). *See also Martinez v. Rabbit Tanaka Corp.*, No. 04-61504-CIV, 2006 WL 5100536, at *14 (S.D. Fla. Jan. 6, 2006) (excluding expert opinion on damages where the expert's methodology was inconsistent with Florida law governing lost profits damages); *Sys. Dev.*

*Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 879 (N.D. Ill. 2012) (excluding expert opinion on economic loss because it included lost opportunity costs that were not a proper component of damages under Illinois law); *Southard v. United Reg'l Health Care Sys., Inc.*, No. 7-06-CV-11-L, 2008 WL 4489692, at *2 (N.D. Tex. Aug. 5, 2008) ("[W]here as here, the expert's opinion is based on an erroneous legal premise, it is appropriate to exclude such testimony.").

The cases cited by Plaintiffs do not alter the Court's conclusion. At oral argument, Plaintiffs' counsel relied heavily on *Machine Maintenance Equipment Co. v. Cooper Industries, Inc.*, 634 F. Supp. 367 (E.D. Mo. 1986), but that case provides no assistance to Plaintiffs. It simply reinforces the general principles on which the Court relied above: that the damages arising from a breach of contract or a breach of the duty of bad faith must be those that result from the breach itself and that damages must be those that place the nonbreaching party in the position it would have been in but for the breach.[9] It does not provide any support for Ms. Gragg's method of calculating lost revenue.

The other cases Plaintiffs cited at oral argument discuss the general principles applicable to the implied covenant of good faith and fair dealing, including the fact that the implied covenant prevents a contracting party from denying the other party the expected benefit of the contract. *See*

---

[9] In *Machine Maintenance*, the defendant terminated the parties' contract on 34 days' notice instead of 90 days' notice, and the plaintiff sued for breach of contract and breach of the duty to deal fairly and in good faith with the plaintiff. 634 F. Supp. at 369, 371. The court noted that "[t]he fundamental measure of contract damages in Missouri is that which places the nonbreaching party in the position it would have been but for the breach." *Id.* at 371. The court noted that the plaintiff "can only recover damages resulting from or incidental to the alleged breach, which under the facts of this case is *not* the termination itself," but rather the provision of 34 days' notice instead of 90 days' notice. *Id.* Addressing the breach of the duty of fair dealing claim, the court noted that "only those damages resulting from defendant's alleged bad faith would be recoverable," giving as an example a situation where the reasons for the termination enumerated by the defendant in its termination letter had been fabricated by the defendant and the fabrication resulted in damages to the plaintiff's business reputation. *Id.* at 372.

*City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 370 (Mo. Ct. App. 2008); *Missouri Consol. Health Care Plan v. Cmty. Health Plan*, 81 S.W.3d 34, 46 (Mo. Ct. App. 2002); *Bishop v. Shelter Mut. Ins. Co.*, 129 S.W.3d 500, 505 (Mo. Ct. App. 2004); *Ischy v. Northwood Energy Corp.*, 203 N.E.3d 1249, 1254 (Ohio Ct. App. 2022). Again, however, these cases do not help Plaintiffs. For purposes of this motion, there is no dispute that Plaintiffs were deprived of the expected benefit of the Agreements—i.e., having the exclusive right to distribute the newspaper within their territories. The issue here is how the loss of that benefit is to be quantified, and the cases Plaintiffs cite do not address that issue.

### IV.  CONCLUSIONS

In sum, the record before this Court demonstrates that Plaintiffs operated within their respective territories for over a decade before Defendants allegedly breached five years ago by offering digital delivery to subscribers within Plaintiffs' territories. As a result, and as Plaintiffs' counsel acknowledged at oral argument, Plaintiffs had access to a trove of profit and loss information that their damages expert could have used to compare the financial performance of their respective territories before and after the alleged breach. Considering Plaintiffs' access to such information, there are undoubtedly a variety of damages calculations Plaintiffs could have proffered through an expert that would have been consistent with one of the three types of breach of contract damages Missouri law allows an aggrieved plaintiff to recover. *See Suppes*, 583 S.W.3d at 61 (identifying actual damages, consequential damages, and benefit-of-the-bargain (lost profits) damages as damages recoverable for breach of contract). Unfortunately for Plaintiffs, the lost revenue calculations proffered by Ms. Gragg is not an approach consistent with the types of breach of contract damages Missouri law allows an aggrieved plaintiff to recover.

For the reasons discussed above, the Court finds that Plaintiffs have not satisfied their

burden of demonstrating that Ms. Gragg's testimony is admissible under Rule 702, and the Court will grant Defendants' motion to exclude her testimony.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Exclude the Proffered Testimony of Melissa Gragg, CVA, MAFF. (Doc. 84) is **GRANTED**.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated: December 28, 2023.